**FILED**

FEB 0 7 2008



CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|                                      |     |                          |
| ------------------------------------ | --- | ------------------------ |
| JERRY S. EMBERLIN                    | \*  | CIV. 06-4136             |
|                                      | \*  |                          |
| Plaintiff,                           | \*  |                          |
|                                      | \*  |                          |
| -vs-                                 | \*  | REPORT and RECOMMENDATION |
|                                      | \*  |                          |
|                                      | \*  |                          |
| MICHAEL J. ASTRUE[1],                | \*  |                          |
| Commissioner of Social Security,     | \*  |                          |
|                                      | \*  |                          |
| Defendant.                           | \*  |                          |
|                                      | \*  |                          |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on May 27, 2003[2], and payment of disability insurance and medical benefits under Title II and Title XVII of the Social Security Act.[3] The Plaintiff has filed a Complaint and

---

[1]Pursuant to 42 U.S.C. 405(g), Michael Astrue has been substituted for JoAnne Barnhart as the named Defendant. Mr. Astrue was sworn in as the Commissioner of the Social Security Administration on February 12, 2007.

[2]As noted in the Commissioner's brief and acknowledged by the Plaintiff, the Plaintiff filed previous applications for SSI/DIB benefits. Plaintiff's previously applied in 1991, 1995, 1997 and 2001. All claims were denied initially and on reconsideration (AR 20). Plaintiff did not appeal the 1991, 1995, or 1997 decisions past the initial and reconsideration levels. The 2001 claim was denied by an Administrative Law Judge on May 27, 2003. The Appeals Council subsequently denied review, and Plaintiff did not pursue a judicial appeal. Thus, Plaintiff's disability status has been conclusively adjudicated through May 27, 2003 (the date of the reconsideration determination on his 2001 claim, which became final when he did not appeal) While none of these administrative records are contained in the transcript of this proceeding, this history is recounted by the ALJ in his decision, and it is not disputed by the Plaintiff. See 20 C.F.R. § 404.957(c)(1) (ALJ may decline to consider one or more issues if the doctrine of res judicata applies because the Social Security Administration has made a previous determination or decision about Claimant's rights on the same facts and on the same issue or issues, and this previous determination has become final by either administrative or judicial action). While none of the historical administrative records are contained in this transcript, some of Plaintiff's medical records which pre-date his current claim for benefits are included.

[3]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether

has requested the Court to enter an order instructing the Commissioner to award benefits. Alternatively, the Plaintiff requests a remand pursuant to 42 U.S.C. § 405(g) sentence four, for a further hearing. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED AND REMANDED for further proceedings.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for benefits on June 27, 2003. AR 55-57, 320-22. In a form entitled "Disability Report–Adult" he filed in connection with his 2003 disability application (AR 71-80). Plaintiff listed the following as illnesses, injuries or conditions that limited his ability to work: "arthritis, herniated disk in back, depression, high blood pressure, gastrointestinal reflux disease." AR 72. He explained that these conditions limit his ability to work in the following ways: "I am in constant pain with limited ability to move or function in a work environment, unable to concentrate." *Id.*

---

the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed his application for both types of benefits at the same time (June 2003). AR 55-57, 320-22. Mr. Emberlin's "date last insured" for SSD/DIB ("Title II") benefits is September 20, 2004. *See* AR 69, 82, 411.

Plaintiff's current claim was denied initially on September 30, 2003 (AR 39, 324), and on reconsideration on December 17, 2003 (AR 45, 329). He requested a hearing (AR 47) and a hearing was held on December 15, 2004, before Administrative Law Judge (ALJ) the Honorable Robert Maxwell. AR 408-467. On April 21, 2005, the ALJ issued a twelve page, single-spaced decision affirming the previous denials. AR 20-31. On May 9, 2005, Attorney Hamilton sent a "Request for Review of Hearing Decision/Order" to the Appeals Council requesting review of the ALJ's decision. AR 15. The Appeals Council received as additional evidence a brief from Attorney Hamilton (AR 332-366) and medical records from the Sioux Falls Veterans Administration Medical Facility (AR 367-407) but nonetheless denied review of Plaintiff's claim on June 9, 2006. AR 5. Plaintiff then timely filed his Complaint in the District Court on August 11, 2006.

## FACTUAL BACKGROUND

Jerry Emberlin was born on August 31, 1961 and was 43 years old at the time of the administrative hearing. AR 55, 413. He is a high school graduate. AR 413. He does not have any post-secondary education. *Id.* His past job experience includes customer service at a home-improvement store, delivery truck driver/unloader, test driver, customer service representative for a home water filtration system company, courier delivery driver, bus driver, and purchasing agent for a family-owned automotive business. AR 416-424. Mr. Emberlin asserts he became disabled in December 2001 and has not worked since that time. AR 411-412. However, his failure to appeal previous benefit denials precludes an award of benefits for any period pre-dating May 27, 2003. His medical condition for that earlier time period, therefore, will be discussed only as necessary to lay the foundation for his current claim.

### Medical Conditions and Treatment

After he moved to Sioux Falls from Gilbert, Arizona in December, 2001. Mr. Emberlin began treating with Dr. Jerel Tieszen (Internal Medicine, Sioux Valley Clinic) in January, 2002. AR 236, 442. Notes from Dr. Tieszen's first evaluation indicate Dr. Tieszen had Mr. Emberlin's medical records from the previous two years for review, but those records are not contained in the transcript. AR 236. From his review of those records, Dr. Tieszen stated "it appears that he has been having progressive degenerative changes, pain. He has progressively had an increase in his

3

medications starting out initially with Darvocet and in the last several months he been (sic) placed on Percocet which he is now taking 2 or 3 tablets p.r.n. for pain." *Id.* Dr. Tieszen noted results of various MRI and diagnostic exams which revealed Mr. Emberlin was not a surgical candidate. Dr. Tieszen also noted Mr. Emberlin was then taking medication for high blood pressure (Accupril) and reflux esophagitis (Prevacid). *Id.*

Dr. Tieszen noted some limitation of motion in Mr. Emberlin's shoulders and low back as well as diffuse tenderness in the hips and knees. Dr. Tieszen's initial impression was the progression of degenerative joint disease, but he wished to refer Mr. Emberlin to rheumatology (Dr. Mallek) for further workup. Dr. Tieszen also noted Mr. Emberlin's high blood pressure was "at the moment out of control." AR 235. Dr. Tieszen renewed Mr. Emberlin's prescriptions for Percocet, Flexeril, Prevacid and Accupril. *Id.*

Dr. Mallek's records are not found in the administrative record. Dr. Tieszen next referred Mr. Emberlin to Dr. Johnson (physical medicine and rehabilitation), who first saw Mr. Emberlin on February 26, 2002. AR 204. Dr. Johnson mentioned Dr. Mallek's evaluation, which did not support a finding of any significant arthritic problems. *Id.* Dr. Johnson stated "however, the plain films of the lumbosacral spine on January 31, 2002, does show spurring of L4 and L5 anteriorly, consistent with slight degenerative changes." Dr. Johnson also noted slight degenerative changes in the right shoulder. *Id.* Dr. Johnson also mentioned studies by Dr. Florio which Dr. Johnson believed showed evidence of mild carpal tunnel syndrome on the right. AR 204. Dr. Johnson's physical examination showed normal strength in the upper extremities and a normal sensory exam. Strength was also normal in the lower extremities. The examination of the back was also normal, although Mr. Emberlin described tingling in the lower-thoracic region. Dr. Johnson's impression was thoracic back pain, probably secondary to bulging discs. AR 203. Dr. Johnson prescribed physical therapy as well as Neurontin, 300 mg. Dr. Johnson noted Mr. Emberlin should "look for some sort of occupation where he does not have to be a laborer" because of Emberlin's degenerative joint disease in the shoulder and lumbar spine. *Id.*

4

Mr. Emberlin returned to Dr. Tieszen on March 18, 2002. He continued to complain of arm and low back pain. AR 232. Dr. Tieszen noted Mr. Emberlin's blood pressure and acid reflux were under good control. *Id.* Dr. Tieszen prescribed Ultram 50 mg and urged Mr. Emberlin to taper off the Percocet for back pain. *Id.*

On March 25, 2002, Mr. Emberlin followed up with Dr. Johnson. AR 202. Dr. Johnson noted excellent strength in his lower extremities and negative straight leg raising bilaterally. *Id.* His gait was normal. *Id.* Dr. Johnson's impression remained chronic back pain, probably arthritic in nature, and bulging discs. *Id.* Dr. Johnson recommended pool therapy, but noted that if the pool therapy did not work, he had nothing further to offer other than ongoing treatment with chronic pain medication. AR 202. Dr. Johnson referred Mr. Emberlin back to Dr. Tieszen for ongoing pharmaceutical therapy. AR 201.

Mr. Emberlin returned to Dr. Tieszen in May, 2002. At that time, Dr. Tieszen noted, "[t]his patient has chronic pain syndrome. He apparently does have some degenerative changes through his spine . . ." AR 230. Dr. Tieszen also noted a significant weight gain, which he believed exacerbated Mr. Emberlin's problems. *Id.* He continued Mr. Emberlin's regimen of Ultram and Percocet, and encouraged him to lose weight. When Mr. Emberlin returned to Dr. Tieszen in July, 2002, Dr. Tieszen noted Emberlin's continued struggle with pain and referred him to Dr. Suga at the Spine Clinic/Orthopedic Institute. AR 228.

Dr. Suga (Orthopedic Institute) examined Mr. Emberlin on August 20, 2002. Dr. Suga's physical examination was essentially normal. AR 209. Dr. Suga reviewed a recently done MRI and noted the cervical region appeared relatively normal, while the lumbar region showed mild stenosis at the L3-4 and L4-5. AR 207. The thoracic MRI showed degenerative changes at the T7-8 with a small pericentral disc herniation , with no compression of the spinal cord. *Id.*

Mr. Emberlin returned to Dr. Tieszen at the end of September, 2002. Dr. Tieszen noted Mr. Emberlin's back pain seemed to be "progressive." AR 226. Dr. Tieszen deferred any opinions on ability to work to Dr. Johnson "who has expertise in these matters."

Dr. Suga examined Mr. Emberlin again in November, 2002. Dr. Suga informed Mr. Emberlin there was no surgical cure for his ongoing back problems. AR 206. Dr. Suga instructed Mr. Emberlin to return on a p.r.n. basis. After the November visit with Dr. Suga, Mr. Emberlin returned to Dr. Tieszen. Mr. Emberlin reported increased pain with any sort of activity. AR 224. Dr. Tieszen noted "by his story it would seem difficult that this patient can gain any meaningful employment with these ongoing symptoms." Dr. Tieszen's January 6, 2003 note contains the following entry, "today was a lengthy session spending 40 minutes with him. In many respects he was lamenting to me with regard to his ongoing frustration which I do understand. He knows very clearly that I have been trying to be comprehensive and trying to understand what is the cause for his symptoms. *I do not doubt his story and I understand the frustrations that this whole process has been for him.* The dilemma is trying to objectively document the cause." (Emphasis added).

In early March, 2003, Mr. Emberlin saw Dr. Tieszen with concerns about depression. AR 223. Dr. Tieszen started Mr. Emberlin on Amatriptyline. Mr. Emberlin saw Dr. Tieszen again in April, 2003 regarding chronic back pain. At that time, Dr. Tieszen continued Mr. Emberlin's pain medication (Endocet) and the Amitriptyline for depression. AR 220.

Mr. Emberlin's previous disability application was denied on May 27, 2003. He returned to Dr. Tieszen on June 2, 2003. Dr. Tieszen acknowledged Mr. Emberlin's blood pressure was elevated because of his frustration at being denied Social Security benefits. AR 217. Dr. Tieszen wrote on a prescription pad the following note: " pt. is on narcotic medication for pain control chronic back pain. Pt. has arthritis with chronic back pain and cannot perform physical activity without pain." AR 218. Mr. Emberlin expressed concern that he was losing his insurance, so he was interested in switching to generic medication. *Id.* AR 217. Dr. Tieszen's impression remained chronic back pain with degenerative changes in the low spine. He continued Endocet and noted "hopefully he can find work that will allow him to have gainful employment without exacerbating symptoms." *Id.*

On September 26, 2003, Dr. Frederick Entwistle, a State Agency Physician, reviewed Mr. Emberlin's medical records and completed a Physical Functional Capacity Assessment Form. AR

165-72. Dr. Entwistle's primary diagnosis was "mild degenerative changes–(illegible) lumbar spine. His secondary diagnosis was "hypertension." He listed "depression" as an "other alleged impairment." AR 165. Dr. Entwistle concluded Mr. Emberlin was capable of medium duty work (occasionally lifting 50 pounds, frequently lifting 25 pounds, and standing, walking, sitting 6 out of 8 hours each working day with normal breaks). AR 166. As support for this conclusion, Dr. Entwistle stated:

> 42 year old male with complaints of chronic back and limb pain. He drives a car. Says he does very little physical activities. He states he is depressed. MD note 9/30/02 states his hypertension is doing well on medication. Rehab MD exam 2/26/02 notes normal strength upper & lower extremities. Sensory normal. DTR's normal. "Back examination reveals that he has a normal back exam with no specific point tenderness." Also states ? Mild CTS. Also notes rheumatologist "did not indicate that the patient has any sort of significant arthritis." Orthopedic exam 8/20/02 states MRI essentially normal. Note 11/12/02 states MRI cervical & lumbar WNL. "Very mild disc herniation at thoracic level which I think is incidental in nature."

AR 166-67. Dr. Entwistle assigned no postural, manipulative, visual, communicative or environmental limitations. AR 167-69.

On December 15, 2003, Dr. Jerome Buchowski reviewed Mr. Emberlin's medical records and completed a Mental Functional Capacity Assessment Form. AR 187-90. He concluded Mr. Emberlin's ability to maintain attention and concentration for extended periods and his ability to accept instructions and respond appropriately to criticism from supervisors was "moderately limited" but that otherwise Mr. Emberlin's abilities were "not significantly limited" or had "no evidence of limitation." AR 187-88. In the explanation section of the form, Dr. Buchowski stated:

> Claimant has pain which has resulted in depression & irritable mood. He does chores & ADLs as physical condition allows. Main concern is medical. If on pain medication concentration can be affected. MRFC is judged as being consistent with work.

AR 189.

Mr. Emberlin was first treated at the Sioux Falls Veteran's Administration facility in March, 2004. AR 248, 315. On March 26, 2004, Mr. Emberlin presented to the VA Urgent Care Clinic

because he ran out of medication and was financially incapable of purchasing any more. AR 315. The VA Medical Center physician's assistant assessed Mr. Emberlin with hypothyroidism, GERD, back pain, and anxiety disorder with depression. AR 316. Mr. Emberlin's medications were continued with instructions to return for a visit with a VA physician in the near future. *Id.* Mr. Emberlin saw the VA psychiatry resident on April 6, 2004. She diagnosed him with recurrent major depressive disorder and assigned a GAF of 60.[4] She increased his Paxil dosage from 25 mg per day to 40 mg per day. AR 313.

Dr. Lorenzo Stars evaluated Mr. Emberlin on July 22, 2004. AR 301. Dr. Stars advised Mr. Emberlin that his lumbar CT and X-rays of his spine appeared negative. *Id.* Dr. Stars offered to compare the VA studies to those previously done elsewhere, and also offered to refer Mr .Emberlin to a neurologist and suggested Mr. Emberlin participate in a pain management course. AR 301.[5] Dr. Stars assessed Mr. Emberlin as suffering from chronic low back pain, degenerative joint disease of the lumbosacral spine[6], hypertension, GERD, and history of depression. AR 302.

Mr. Emberlin presented at the VA Medical Center again on August 13, 2004. He was evaluated by psychiatry resident Wioleta Mazurczak. AR 297. His current medications were 60 mg Paxil and 50 mg Amitriptyline. His chronic back pain was "under good control on the

---

[4]GAF stands for Global Assessment of Functioning. A rating of 60-65 indicates "**some mild symptoms** (e.g. depressed mood and mild insomnia) **OR some difficulty in social, occupational or school functioning**(e.g. occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders, at p. 32 (4[th] Ed. 1994) (emphasis in original).

[5]Dr. Charles Flohr, a VA radiologist, did compare the studies on August 24, 2004. AR 289. He noted no discrepancy between his interpretation and the original review conducted in 2002. He did note that in the intervening two years structural changes could have occurred. He suggested a follow-up or repeat study if the clinical findings and clinical history show evidence of significant change in Emberlin's condition. AR 290.

[6]Dr. Stars' note refers to "DJD" which is defined by *Stedman's Medical Dictionary* (28th Ed. 2006) as the abbreviation for degenerative joint disease.

medications he [was] on." *Id.* Ms. Mazurczak placed Emberlin's GAF at 65.[7] She renewed his Paxil and Amitriptyline and instructed him to return in three months.

Mr. Emberlin reported to the VA Medical Center pain clinic in late August, 2004. AR 292-94. Mr. Emberlin described arthritic pain all over his body which hurt worse with movement. AR 294. The pain on the date of his visit was an "8" out of "10." He described the pain as a continuous, aching pain, but sometimes like a fist crushing or pressing on his back. *Id.* Laying down seemed to help, as did his medications (Percocet and Amitriptyline). *Id.* Mr. Emberlin explained that although he had not tried injections, he had tried acupuncture. He had seen the orthopedic, occupational therapy, and neurology specialists. He also explained he was not a surgical candidate. He tried glucosamine but discontinued that because it upset his stomach. AR 295. He also listed several herbal medications he had tried in the past. He verbalized interest in trying a TENS unit, which he used in the past with some success. *Id.* Mr. Emberlin attributed decreased appetite, sleep, concentration and physical activity , as well as an increase in irritability and volatile emotions, to his pain condition. Mr. Emberlin's physical exam was normal. AR 296. The physician's assistant's impression was chronic pain syndrome of uncertain etiology. *Id.* The PA ordered a TENS unit and several diagnostic tests and considered starting Mr. Emberlin on MS Contin.[8]

Dr. Jem Hof reported a phone call to the Pain Clinic from Mr. Emberlin on September 3, 2004. Emberlin had doubled his dose of Ultram without any benefit. AR 288. Dr. Hof noted Mr. Emberlin's upcoming neurology appointment and considered another psychiatry evaluation. Dr. Hof decided to discontinue the Ultram and begin a course of low dose MS Contin (morphine). *Id.* Dr. Hof began with a prescription for 15 mg of MS Contin twice per day. *Id.*

Mr. Emberlin presented to the VA Medical Center again on October 25, 2004 complaining

---

[7] See fn. 4 above.

[8] MS Contin is a morphine sulfate controlled release tablet. It is indicated for the relief of moderate to severe pain and intended for use in patients who require repeated dosing with potent opoid analgesics over periods of more than a few days. www.rxlist.com

of back pain. AR 281. At that time, Mr. Emberlin reported his dosage of morphine remained 15 mg twice per day. AR 282. He also reported his recent trial of a TENS unit. According to Mr. Emberlin, both the morphine and the TENS unit "seemed to help" his back pain. *Id.* His physical exam was again essentially normal with the exception of limited abduction bilaterally attributed to shoulder pain. He reported pain at 30 degrees in the straight leg raising test but denied radiation into the lower extremities. Muscle tone was normal and gait was stable. AR 282-83. Again the physician's impression was chronic pain. AR 283. Because the "all over" pain could not be explained by a thoracic disc problem, an MRI of the thoracic spine was ordered to further evaluate the severity thoracic disc issue. *Id.* Dr. Richards also noted that despite the stated effectiveness of the morphine, Mr. Emberlin still reported sleeplessness because of pain. AR 280. Dr. Richards said the possibilities included "any number of chronic pain syndromes, seronegative rheumatoid arthritis, HLAB27 -negative spondyloarthrorpathies, affective disorder, and drug addiction." AR 280-81. Dr. Richards referred Mr. Emberlin to rheumatology for further diagnosis and treatment. AR 281.

Dr. Jem Hof (Rehabilitation Medicine) saw Mr. Emberlin on October 27, 2004. Mr. Emberlin reported a pain level of 4/5 out of 10 on that day. Dr. Hof's impression was diffuse spinal pain, secondary to osteoarthritis. AR 276. He recommended increasing the dosage of MS Contin to 15 mg three times per day. *Id.*

Mr. Emberlin received follow up care for his depressive symptoms on November 2, 2004. AR 272. He reported guilt and frustration about his inability to contribute financially to the household expenses which were carried solely by his fiancee. AR 273. He also reported his son who lived with them for a short time recently moved back to Arizona. *Id.* Mr. Emberlin discussed insomnia and panic attacks which he attributed to his physical condition. *Id.* The mental health provider assessed his condition as major depressive disorder, recurrent, with chronic back pain, degenerative arthritis, and herniated disc. She assigned a current GAF of 55.[9]    She also added Seroquel to his drug regimen for panic attacks and insomnia. AR 273.

_____

[9] According to the DSM-IV, a person with a GAF of 55 demonstrates moderate symptoms, moderate difficulty in social, occupational or school functioning.

10

In December, 2004, Mr. Emberlin received a rheumatology consult at the Sioux Falls VA Medical Center. AR 397. Dr. Joseph Fanciullo examined previous records and films. He noted Mr. Emberlin's negative rheumatoid factor, normal blood markers for inflamation, negative ANA, negative HLA-B27. Dr. Fanciullo interpreted Mr. Emberlin's x-rays as suggestive of osteoarthritis and degenerative spondylosis. AR 397. His impression was degenerative (but not inflammatory) arthritis. Dr. Fanciullo compared Mr. Emberlin's joint examination and x-rays and found that while Mr. Emberlin definitely had degenerative arthritis, his pain complaints were out of proportion to the physical findings. AR 398.

Mr. Emberlin returned to the VA Medical Center for a mental health follow up on February 7, 2005. AR 392. Mr. Emberlin reported his mood was "okay" except for chronic pain issues and sleep was "fair" except he did not fall asleep until 1:00 a.m. and then awoke approximately three times per night. *Id.* He described his mood as "okay" and his pain as "significant." AR 393. The psychiatry resident continued Mr. Emberlin's medications except Seroquel, which was discontinued because it gave Mr. Emberlin a rash. *Id.*

Mr. Emberlin saw a physician's assistant on April 7, 2005 regarding severe back pain. AR 387-88. He reported that although his prescription dosage of morphine was three tablets per day, he had been taking four to six tablets per day. AR 388. He also reported episodes of right arm and left leg numbness. His physical exam was relatively normal except decreased sensation in the right arm and spinal tenderness over the thoracic area. *Id.* The physician's assistant scheduled an exam with Dr. Hof because of the need for a narcotic prescription. AR 389.

Mr. Emberlin's April 11, 2005 mental health re-check revealed a "100% back to normal" mood with Paxil. AR 386. He cited "arthritis" as his biggest limitation. *Id.* He mentioned that he discontinued Seroquel because of a rash. He also discontinued Trazodone–he said it was difficult for him to adjust but the reason for the difficulty is not specified. AR 386. After discussion with his doctor Mr. Emberlin decided to decrease the dose of Paxil because he believed a smaller dose was acceptably effective. *Id.*

11

Mr. Emberlin returned to the VA Medical Clinic on April 28, 2005 (approximately one week after the unfavorable opinion from the Administrative Law Judge). AR 383. At that time Mr. Emberlin reported to the rehab clinic, where he complained of midthoracic pain in addition to his chronic low back pain. *Id.* Nothing alleviated the pain except increased morphine. Mr. Emberlin explained that when his pain was bad he increased his morphine dose to four tablets per day instead of three. *Id.* Mr. Emberlin also reported decreased sleep (three to four hours per night) for the past month. A few days later (on May 3, 2005) Dr. Hof increased Mr. Emberlin's morphine dosage from 15 mg three times a day to 30 mg two times a day. AR 385.

When Mr. Emberlin returned to the VA Medical Center Pain Clinic again on June 1, 2005, he reported a pain level of 2/3 out of 10 when medicated and 8/9 out of 10 when un-medicated. AR 381. His poor sleep continued, and he reported tingling in his toes and hands. *Id.* Dr. Hof's physical exam revealed back tenderness, but a functional range of motion. AR 382. Dr. Hof's impression remained active thoracic discogenic disease and chronic low back pain secondary to lumbar facet arthropathy. Dr. Hof renewed Mr. Emberlin's morphine prescription and instructed him to return in six months. *Id.*

Mr. Emberlin returned for a routine follow-up visit with Dr. Cruz (psychiatry resident) on July 11, 2005. On that day he felt weak, dizzy and fatigued, but reported before then, he had been feeling "great" in a good mood and able to fish and garden. AR 376-77. He feared he had contracted West Nile virus, a condition about which the psychiatry resident referred him to his primary care doctor. AR 377. She noted that before Thursday of that week, he had been feeling well, with "no depression, no anxiety, and no elevation in his mood." *Id.* She continued his Paxil prescription (40 mg per day). The Paxil dosage was increased to 60 mg per day when Mr. Emberlin returned in November, 2005 because of "current depressive symptoms." AR 375.

The final substantive medical note from the VA Hospital contained in this record is from

December, 2005.[10] Mr. Emberlin returned to the VA Pain Clinic on that date for a follow-up visit
regarding his back pain. AR 373. He reported a current pain level of 8 out of 10. He indicated any
type of activity aggravated the pain. *Id.* Again his physical examination was normal except for back
tenderness and pain. His range of motion was functional and strength was relatively normal. AR
374. Dr. Hof again increased Mr. Emberlin's morphine dosage from 30 mg twice a day to 30 mg
twice a day and 15 mg at noon. *Id.*

### Hearing Testimony

The hearing on this matter was held on December 15, 2004. Mr. Emberlin was represented
by legal counsel at the hearing. Mr. Emberlin, his fiancee (Kathy Baxter) and a vocational expert

---

[10]While the ALJ issued his opinion on April 21, 2005, some of the VA medical records
submitted for the Appeals Council's review are dated before April 21, 2005 and some are dated
after that date. As such, some of this information is considered when deciding whether the
Commissioner's decision is supported by substantial evidence. Some of the evidence which was
submitted to the Appeals Council but which was not considered by the ALJ, however, is not
appropriately considered. In cases involving submission of supplemental evidence subsequent to
the ALJ's decision, the record may include evidence submitted after the hearing and considered
by the Appeals Council. *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000). "In practice,
this requires [the court] to decide how the ALJ would have weighed the new evidence had it
existed at the initial hearing." Id. 20 C.F.R. § 404.970(b) requires the Appeals Council to
consider additional evidence submitted only if it is new, material, and "*relates to the period on or
before the date of the administrative law judge hearing decision* . . ." The date of the medical
examination is not dispositive of whether the evidence is material, but rather whether the
information contained in the submitted records relates to the claimant's condition during the
relevant time. *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990).

For the most part, then, the relevant additional VA records in this case are those dated up
until the date of the written decision–April 21, 2005 unless records after that date contain
reference to Mr. Emberlin's condition during the relevant time. The significance of the VA
records which post-date the hearing in this case is further complicated, however, because in order
to become entitled to *Title II* benefits Mr. Emberlin must prove he was disabled on or before
September 30, 2004. So, those VA records which pertain to his condition for the time frame
between October 1, 2004 and April 21, 2005 are relevant to show Mr. Emberlin's entitlement to
SSI benefits, but not his entitlement to SSD/DIB benefits. *See e.g. Moore v. Barnhart*, 405 F.3d
1208 (11th Cir. 2005) (for DIB claims a claimant is eligible for benefits where she demonstrates
disability on or before the date last insured, for SSI claims a claimant is eligible where she
demonstrates disability between the date of her application and the date of the ALJ's decision).

(Tom Audet) testified at the hearing. AR 410. Mr. Emberlin testified that he was then 43 years old, a high school graduate with no post-high school education. AR 413. His understanding of his disabling condition is: degenerative arthritis in his ankles, knees, hips, spine, shoulders, hands, wrists, elbows, and neck. He believes he has a herniated disc in the T6-T7, T7-T8 and a slight herniation in the C5 and T1 along with congenital narrowing in the lumbar region of the spine. He explained he had "no idea" what all that means, other than "it creates extensive amounts of pain, and limited flexibility and activity." He also said he has chronic depression because of his pain. AR 416.

Mr. Emberlin  participated in vocational rehabilitation near the end of 2003. AR 414. During that ten week program, his ability to be retrained in light duty computer-related jobs was evaluated, as well as his ability to function in a retail environment such as Goodwill. *Id.* He was unable to obtain employable level typing skills, and was physically unable to handle working in the retail environment at Goodwill. AR 414-15. He was eliminated from the rehabilitation program because it became apparent the program would not be productive for him. AR 415.

Mr. Emberlin last worked in December, 2001 for Lowe's Home Improvement Store in Gilbert, Arizona. AR 416. There he unloaded trucks, stocked shelves, did inventory, and helped customers. He left that job after eleven months when his supervisor told him he would be replaced because he was physically incapable of performing the job requirements. AR 418. Mr. Emberlin's other job experience included driving a truck for a concrete business. That job required him to load and unload large sections of boards from the trucks. AR 420. He does not believe his is capable of performing that job any longer because of his pain symptoms, and because his morphine dosage prevents him from driving a commercial truck. *Id.* He also has experience as a test driver for an engineering company. AR 420-22. This job required heavy lifting and driving. Again, Mr. Emberlin does not believe he is capable of returning to that job because of his pain symptoms and inability to drive on a commercial basis. AR 422. He also worked for a home water filtration system. *Id.* That job required him to lift 80 pound bags of salt. AR 423. Again, Mr. Emberlin believes he is currently incapable of performing that job because of pain symptoms and the inability to drive commercially.

14

*Id.* His other previous employment (working for a courier service and driving a bus) is also precluded by his inability to drive on a commercial basis. *Id.* The only other relevant work was for his parents' business. AR 424. That work included reordering products, unloading trucks and lifting between 40 and 300 pounds. Mr. Emberlin can no longer do that job for two reasons: his parents no longer own the business, and he is not physically capable of any of the job requirements except sitting in the office. AR 424.

Mr. Emberlin believes his condition has gotten progressively worse since August, 2001. At the time of the hearing, he took morphine three times per day. AR 425. When he gets up in the morning, he snaps crackles and pops for between one half hour to two hours. AR 426. His doctors refer to this as "gel time"–the time until things loosen up. *Id.* If he sits and watches a movie, or sits in a car–anything that causes him to be still for too long, the "gel time" starts all over again. AR 429. He explained that in the morning, his joints and hands are stiff, numb and painful. *Id.* The pain varies from sharp pains to continuous aches, severe aches, to stabbing pains. *Id.* The pain is much less when he takes medication. He explained it this way, "I'd forgotten how much it hurts without the pain killers because the pain is always there." AR 426. The weather also affects his pain level. AR 427.

Mr. Emberlin also explained that sitting or standing too long or walking too much increases his pain. AR 427. Actually "anything done in excess" makes the pain worse. *Id.* Sitting too long causes his back to hurt and become stiff. AR 435. Usually he cannot sit still for longer than fifteen minutes. *Id.* If he sits too long, his "gel time" starts all over again. AR 435. He can stand for about 10 minutes without problems. AR 437. Other than medications, maintaining his weight, doing stretching exercises, following his physicians' instructions, and lying down ease the pain. *Id.* The pain gets worse as the day progresses. AR 428. Mr. Emberlin goes to bed about midnight or 1:00 a.m., sleeps for three hours or so until he is awakened by pain. He gets up and moves around for a few hours then returns to sleep in his recliner. AR 428. His recliner seems to be the most comfortable place for him to sleep. *Id.* He also explained he has difficulty falling asleep because he cannot get comfortable. AR 429.

Mr. Emberlin described a good day as one when he is able to help around the house, or get out of the house and do things with his fiancee. A bad day is one in which he feels do bad he does not even want to be around anyone. AR 430. He estimated he usually has three "really bad" days a week. AR 431. His doctors have advised him to keep his weight under control. *Id.* They have also advised him to do stretching exercises. *Id.* He has tried several medications to control his pain, including Darvocet, Percocet, and non-narcotic medication. Morphine works the best. AR 431. He has been through acupuncture, physical therapy, pool therapy, and "all types of different pain management programs." AR 448. None of his physicians have told him he was abusing medications or drug-seeking. *Id.* He has no history of chemical dependency. AR 449. He uses a TENS unit three or four times per week for headaches. AR 445. He also takes Paxil for depression and medication for high blood pressure. AR 432. He explained the Paxil prevents him from being an angry, unhappy person. *Id.* The morphine and Paxil cause him to be drowsy and sometimes weak and fatigued. *Id.* The morphine allows him to reduce his pain level to a 2-4 out of 10. AR 450. He is not supposed to drive or operate machinery because the morphine slows his reflexes and affects his vision and concentration. AR 433. He also believes his medications have affected his ability to concentrate. AR 433-34. He said sometimes his laundry sits in the washer or dryer for a week because he forgets about it. AR 435.

Mr. Emberlin explained that when he helps around the house, he runs the dish water and puts the dishes in, but then goes and sits down. AR 437. If he does the dishes by himself it takes him all day. *Id.* He does his own laundry and gets the mail. AR 440. Once in a while he takes the trash out. *Id.* Otherwise, his fiancee does all the housecleaning. *Id.* They have large yard and a riding lawnmower, which he can operate for about ten minutes at a time. AR 440. He walks for twenty minutes at a time three times per week. *Id.* If he tries to walk farther than that, it becomes so painful that it makes his stomach hurt. AR 438. He estimated he could carry a ten pound grocery bag in each hand for forty-five feet. *Id.* He avoids bending, twisting and kneeling because they cause intense pain. *Id.* Descending stairs is very difficult, but ascending is easier. *Id.* He has difficulty doing fine work with his hands and for that reason does not tie or untie his shoes. AR 439. Some days he can button his shirt and some days he cannot. *Id.* He cannot write for more than five or ten

consecutive minutes. *Id.* He drives only when necessary, and then only in fifteen minute intervals. If his fiancee is available, she always drives. AR 439.

Mr. Emberlin said that while no physician has recommended surgery, Dr. Tieszen and his Orthopedic Institute  physicians have all told him he should not work.  AR 444.

Mr. Emberlin's fiancee Kathy Baxter also testified at the hearing.  She said she believes he is in pain because he does not sleep well, and he cannot go up and down stairs more than once a day. When he offers to do the dishes for her it takes him hours to get them done. AR 452.  She said he gets very irritable and moody when his pain increases.  *Id.*  She believes the morphine is better at controlling his pain, but it makes him more forgetful.  *Id.*  She has to leave him notes, otherwise he forgets what she told him to do. AR 453.  She does the cleaning in the house.  *Id.*  She also does the majority of the driving. AR 454.  When he goes shopping with her, he cannot shop for more than an hour before his back becomes very sore.  *Id.*  She attended a few of Mr. Emberlin's doctor appointments when the doctor advised him not to drive a vehicle or operate heavy machinery because of his medication (morphine).

### Vocational Testimony

Vocational expert Tom Audet also testified at the hearing.  AR 457.  He characterized all of Mr. Emberlin's previous relevant work as medium or heavy or very heavy duty.  AR 459.  He also explained Mr .Emberlin had transferrable skills to light, but not sedentary work.  *Id.*  Those skills were sales, customer service and retail skills.

The first hypothetical question the ALJ posed to Mr. Audet asked him to assume a person under age 50, high school education with Mr. Emberlin's  work history and the work-related limitations Mr. Emberlin described at the hearing.  AR 460.  Given that scenario, the VE testified Mr. Emberlin would not be able to return to any of his past relevant work or any gainful work.  *Id.*

The second hypothetical question the ALJ posed to the VE asked him to assume a person

under age 50, high school education with Mr. Emberlin's work history and the work-related limitations imposed by the State Agency assessment performed by Dr. Entwistle in September, 2003. AR 461. In other words, the VE assumed Mr. Emberlin was capable of medium duty work: he could lift 50 pounds occasionally, 25 pounds frequently, and could stand, sit and walk 6 hours out of an 8 hour day. Pushing and pulling was unlimited, and no other manipulative, visual communicative or environmental limits were imposed. The VE testified that according to the second hypothetical, Mr. Emberlin would be capable of his past relevant work of truck driving, test driving, sales, shuttle driver, courier, and purchasing agent. AR 461-62.

The ALJ proposed a third hypothetical when he added the restriction from the mental RFC form (AR 462) of difficulty in maintaining concentration for extended periods. Given this restriction, the VE explained Mr. Emberlin was not capable of any kind of job which involved driving. AR 462. He also eliminated semiskilled and skilled jobs. AR 463. "This person should probably do more unskilled work where the demands in concentrating aren't so great and that you do routine repetitive kind of work where you can really kind of daydream and still do the work." The VE concluded that unskilled medium, light and sedentary jobs remained within Mr. Emberlin's capabilities. AR 463. All of Mr. Emberlin's past work was vocationally eliminated. *Id.* Jobs within his capabilities included factory packager, hand packager, and machine packager–all routine repetitive jobs which are available in the "tens of thousands" in the regional economy. AR 463. The VE also cited janitor as a possible vocation for Mr. Emberlin, with between 10,000 and 15,000 positions in the regional economy. AR 464. The VE stated, however, that if Mr. Emberlin's hearing testimony regarding his own limitations were assumed credible, he would not be capable of full-time employment in any occupation. AR 465.

Upon cross-examination by Mr. Emberlin's counsel, Mr. Audet acknowledged he did not know whether at the time of the State Agency evaluation in September, 2003, Mr. Emberlin was taking the prescription medication morphine. AR 466. Mr. Audet agreed that if Mr. Emberlin's morphine intake decreased his ability to concentrate from "moderate" to "marked" Mr. Emberlin would be incapable of concentrating well enough to perform even unskilled work. AR 466.

18

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

Additionally, when the Appeals Council has considered new and material evidence and declined review, the Court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir.

19

1998)(citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  *Smith*, 982 F.2d at 311.

### B.   The Disability Determination and The Five Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.  The ALJ applies a five step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary.  *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985).  The five steps are as follows:

**Step One:**   Determine whether the applicant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step.  NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).  If

the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

### C.    Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

### D.    The ALJ's Decision

The ALJ issued a twelve page, single-spaced decision on April 21, 2005.  The ALJ's decision discussed steps one through five of the above five-step procedure.

At step one, the ALJ found Mr. Emberlin had not engaged in substantial gainful activity since his alleged onset date. AR 30.

21

At step two, the ALJ found Mr. Emberlin's "mild degenerative changes and depression are considered 'severe' based on the requirements of 20 C.F.R. §§ 404.1520(c) and 416.920(c)." AR 30.

At step three, the ALJ found "these medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." AR 30.

At step four, the ALJ found Mr. Emberlin's allegations regarding his limitations were not totally credible. While the ALJ found Mr. Emberlin's fiancee's testimony "sincere and genuine" he did not accept it as a basis for a finding of disability. AR 30. The ALJ assigned an RFC of a "significant range of medium work." AR 28-29. Specifically, the ALJ determined Mr. Emberlin was capable of occasionally lifting/carrying 50 pounds, frequently lifting/carrying 25 pounds, and standing/sitting/walking for 6 hours with normal breaks during an 8 hour work day. Push/pull activities and other postural and manipulative activities were unlimited. AR 30. Mentally, Mr. Emberlin was capable of "simple, routine repetitive tasks." The ALJ determined Mr. Emberlin was not capable of any of his past relevant work. AR 28.

At step five, the ALJ determined Mr. Emberlin is capable of other substantial gainful employment. Specifically, the ALJ determined Mr. Emberlin is capable of working medium un-skilled jobs such as a hand packager, machine packager, or janitor. AR 30. As such, the ALJ determined Mr. Emberlin is not "disabled."

### E.    The Parties' Positions

Mr. Emberlin asserts the ALJ erred by finding him not disabled within the meaning of the Social Security Act. He asserts the ALJ erred in three ways: (1) by improperly disregarding the opinions of his treating physicians; (2) by improperly discrediting his subjective complaints; and (3) by posing a flawed hypothetical question to the vocational expert. The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

### F.   Analysis

At the outset, it should be noted that "res judicata bars subsequent applications for SSDI and SSI based on the same facts and issues the Commissioner previously found to be insufficient to prove the Claimant disabled." *Hillier v. Social Security Administration*, 486 F.3d 359, 364 (8th Cir. 2007). If res judicata is applicable, medical evidence from a previous proceeding cannot be reevaluated to prove disability.  Id.  Res judicata is only preclusive of an award of benefits if the claimant presents no new evidence that "[his] condition has changed or deteriorated."  *Id.* at 365.  A final judgment denying an earlier application based on res judicata principles does not render evidence submitted in support of the earlier application inadmissible.   The evidence should be considered (though only in combination with later evidence) that the claimant has become disabled after the period covered by the first proceeding. *Camara v. Barnhart*, 2005 WL 3434034 (D. Mass); *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (same). *See also Hillier v. SSA* 486 F.3d 359, 365 (8th Cir. 2007) ("especially in the context of a progressive disease or degenerative condition, evidence that is offered as proof of a disability, and not found persuasive by an ALJ in a prior proceeding may be considered in a subsequent proceeding in combination with new evidence for the purposes of determining if the claimant has become disabled since the ALJ's previous decision.").

With these standards in mind it is  remembered as this claim is evaluated that the condition Mr. Emberlin claims progressed  or deteriorated since his  last unsuccessful disability claim is  that his chronic back pain has worsened, requiring regularly increasing doses of narcotic medication to keep it at a manageable level.

Mr. Emberlin  asserts the ALJ made three mistakes:  (1) rejecting or ignoring the more recent opinions of his treating physicians at the VA Hospital in favor of outdated reports from State Agency doctors;  (2) improperly discrediting his subjective complaints; and (3) posing a flawed hypothetical question to the vocational expert.    These assertions will be examined in turn.

#### 1.   The ALJ's Evaluation of the Medical Evidence

The ALJ found "there is no . . . treating or examining physician support for his limitations,

let alone support for disability." AR 27.  Instead, the ALJ relied upon a State Agency consultative physician (Dr. Entwistle) who reviewed Mr. Emberlin's records, but never examined Mr. Emberlin, and determined he was capable of full-time medium duty work. *Id.*

"[A treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified.  When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater weight than any other physician's opinion." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991). To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).[11]  When the treating physician's conclusions are based in part on subjective complaints which are properly found to be not credible by the ALJ, the ALJ may reject those conclusions upon which the physician based his findings on the subjective complaints. *Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996).

The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.  "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Apfel*, 345 F.3d at 610 (citations omitted).  "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." *Id.* Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Sing v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).  Also, 20 C.F.R. § 404.1527(d) provides the factors to consider for assigning weight to medical opinions. That regulation provides:

---

[11]Although these cases refer to treating and examining/consulting physicians, the same logic would apply to the weight to be given to the opinions of examining/consulting versus non-examining physicians, which is the situation in this case.  See also 20 C.F.R. 404.1527(d) which explains the proper weight to be assigned to all medical opinions contained within the administrative records and the factors to consider when evaluating the appropriate weight to assign to medical opinions whether they be treating, examining, or consulting.

(d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) Length of treatment relationship and frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****. When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of

25

treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Mr. Emberlin asserts the ALJ erred by relying on the State Agency evaluations (Dr. Entwistle and Dr. Buchowski) which were both performed in late 2003 because (1) neither of those physicians physically examined him, while the VA physicians did; and (2) neither of their opinions took into consideration his increasing narcotic dosage of morphine, which began in September, 2004 and continued through the date of the ALJ's decision. Additionally, when asked to support his opinion, Dr. Entwistle cited medical records dated no later than November 12, 2002. The State Agency physician, therefore, did not have an accurate or up-to-date view of his condition.

The Court agrees that the ALJ's rejection of treating physician information in favor of adopting of the State Agency's residual functional capacity evaluations is not supported by substantial evidence. The ALJ acknowledged that beginning in 2002, Emberlin's treating physicians (then Dr. Johnson) recommended that because of his degenerative joint disease he should refrain from "laborer" type employment. AR 24. The ALJ also acknowledged Dr. Tieszen's June, 2003 note in which Dr. Tieszen expressed that "hopefully he can find work that will allow him to have gainful employment without exacerbating his symptoms." AR 217. Earlier, in January 2003, Dr. Tieszen clearly stated that although the scans had shown degenerative changes and disc bulging, no abnormalities of a surgical nature could be found. Dr. Tieszen stressed that "it would seem difficult that this patient can gain any meaningful employment with these ongoing symptoms" and "I do not doubt his story . . .

26

the dilemma is trying to objectively document the cause." AR 224.[12]

By September 20, 2004 (the date Mr. Emberlin was last insured for Title II (SSD/DIB) benefits, the VA physicians had evaluated him and continued to advise that his diagnostic films were relatively normal. *See e.g.* AR 301. Nonetheless, their diagnosis was chronic back pain, degenerative joint disease of the lumbosacral spine, and depression. AR 302. By September 3rd, 2004, Dr. Hof had prescribed morphine (15 mg twice per day). AR 288. In his decision, the ALJ states "the Mental Functional Residual Capacity judged that the claimant's pain medication and concentration may be affected, however they judged him as being consistent with the ability to work." The Mental Functional Residual Capacity, however, was completed on December 15, 2003, before Mr. Emberlin began taking morphine. The existence or effect of Mr. Emberlin's morphine dosage, therefore, was unknown to the non-treating non-examining physician upon which the ALJ relied. For this reason as well, the ALJ's reliance on the State Agency evaluation is not supported by substantial evidence.

Similarly, the evidence upon which Dr. Entwistle based his opinion is dated no later than November, 2002 (the same evidence upon which the previous denial was based). That evaluation ignored the evidence most crucial to this claim– Mr. Emberlin's treatment and evaluation between May 2003 and the date when this current claim was decided. The question here is not whether the previous denial was justified, but whether Mr. Emberlin's condition has sufficiently deteriorated to now render an award of benefits appropriate. Reviewing old evidence but considering nothing new will not answer the pertinent question. For this reason, the ALJ's reliance on Dr. Entwistle's State Agency RFC evaluation is likewise not supported by substantial evidence.

---

[12]While whether Mr. Emberlin was disabled on or before May 27, 2003 may not be re-adjudicated, his physician's statements before that date can be considered in combination with later evidence to decide whether his condition then, combined with the deterioration which has occurred since then, is enough to render him disabled. Therefore, the ALJ's statement that "there is no other treating or examining physician support for his limitations let alone for disability" renders the pre-May 27, 2003 physician statements fair game in this disability determination.

Finally, it is not entirely clear whether the ALJ or the Appeals Council considered any evidence of Mr. Emberlin's condition after September 30, 2004. While his insured status expired for SSD/DIB purposes on that date, he may still receive SSI benefits if he became disabled sometime after that date. There is no mention in the ALJ's opinion of any evidence after the August, 2004 note from the VA Hospital.[13] While not many of those records may have been available to the ALJ (the hearing was held in December, 2004) his opinion was not issued until April 2005. So any records submitted to the Appeals Council which are dated before April 2005 should have been considered for purposes of the SSI claim. *See e.g. Moore v. Barnhart*, 405 F.3d 1208 (11th Cir. 2005). By April, 2005, Mr. Emberlin's morphine dose had been increased at least once. AR 385.

For all of these reasons, the ALJ's adoption of the opinions of the State Agency non-treating, non-examining physicians for purposes of determining Mr. Emberlin's residual functional capacity (mental and physical) is not supported by substantial evidence.

### 2.    Credibility Determination

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Critical to the ALJ's determination was his finding that Mr. Emberlin's pain complaints were not credible. At the fifth step, the ALJ disregarded the opinion of the vocational expert which included the limitations described by Mr. Emberlin. Rather, the ALJ accepted opinion of the vocational expert which included the limitations described by the State Agency medical consultants.

Ordinarily, credibility determinations are peculiarly for the finder of fact. *Kepler v. Chater,* 68 F.3d 387, 391 (8th Cir. 1995). Findings as to credibility, however, should be closely and affirmatively linked to substantial evidence and "not just a conclusion in the guise of findings." *Id.*

---

[13]The ALJ's opinion does state in two places that Mr. Emberlin was not disabled "prior to September 30, 2004 and through the date of this decision." The failure to discuss any evidence after August, 2004, however makes it unclear whether anything after that date was considered.

The ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain is a critical issue. *Id.*  Thus, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

When evaluating evidence of pain, the ALJ must consider: (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also* 20 C.F.R. § 1529. The ALJ may not reject a claimant's subjective pain complaints solely because the objective medical evidence does not fully support them. *Polaski* at 1320.  The absence of objective evidence is merely one factor to consider. *Id.*

When a Plaintiff claims the ALJ failed to properly consider his subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. *Masterson*, 363 F.3d at 738-39 (emphasis added).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. *Id.*

The ALJ recited the *Polaski* factors on page 4 of his written opinion (AR 23). He rejected Mr. Emberlin's subjective pain complaints as "not totally credible for the reasons set forth in the body of this decision" while he accepted Ms. Baxter's testimony as "sincere and genuine, however [it] does not alone provide a basis for finding disability." AR 30.  The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when he Mr. Emberlin's subjective pain complaints were "not totally credible."

First, the ALJ discussed Mr. Emberlin's daily activities.  He noted Mr. Emberlin is "able to

care for his own personal needs, prepares his own meals, does household chores, watches television frequently, goes out of his home 2 to 3 times a week, and drives to the store, doctor appointments and the pharmacy." The ALJ also cited the fact that Mr. Emberlin is able to "do his own laundry, dishes, get the mail, take the trash out and lawn mowing with a riding lawn mower." AR 23. Mr. Emberlin testified, however, that his fiancée does all the household cleaning, and when he does the dishes it takes him all day. He takes the trash out "once in a while" and can operate the lawnmower for ten minute at a time. His driving is very limited and his fiancée does the driving whenever she is available. The Eighth Circuit has noted many times that "An SSI Claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989).

The ALJ cited Mr. Emberlin's claimed subjective pain complaints, the medications he currently used[14] and Mr. Emberlin's medical history which suggested chronic back pain with degenerative changes in the low spine. The ALJ recited Mr. Emberlin's treatment history beginning in 2002, through August, 2004. The ALJ again recited Mr. Emberlin's ability to care for his own personal needs and do household chores. He noted "while the Claimant may indeed have chronic back pain and symptoms of depression, it must be noted that he has relief with his medications (with minimal side effects) stretching exercises and TENS unit. The only restriction that was placed on claimant was that he should avoid driving with the prescription of morphine." The ALJ continued, "The medical evidence indicates that the claimant did indeed seek a lot of consultation for his chronic back pain and depression. However the physicians have advised that through all of the MRI and CT scans that there appears to be no significant abnormalities . . ." The ALJ noted Dr. Johnson's February, 2002 suggestion to seek jobs which were not in the nature of a "laborer" and concluded this

---

[14]The ALJ acknowledged that Mr. Emberlin was taking morphine, that Mr. Emberlin claimed he should not drive because of his current morphine dosage, and that the State Agency physician had acknowledged pain medication may affect Mr. Emberlin's ability to concentrate. AR 24, 27.

should "lead one to believe that he could perform other work that was not of heavy exertion." AR
26. "An Administrative law judge may not draw on his own inferences from medical reports."
*Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). The only direct reference to Mr. Emberlin's
ability to work contained in the medical records came from Dr. Tieszen's January, 2003 note: "by
his story it would seem difficult that this patient can gain any meaningful employment with these
ongoing symptoms . . .I do not doubt his story . . ." AR 224. Despite this the ALJ found "no other
treating or examining physician support for his limitations, let alone support for disability." AR 27.
The ALJ did not attempt to extract an opinion regarding Mr. Emberlin's ability to work or the affect
of his then current medications from his treating physicians at the VA Medical Center. *See Nevland
v. Apfel* 204 F.3d 853, 858 (8th Cir. 2000) ("in spite of numerous treatment notes . . . not one of
[claimant's] treating doctors was asked to comment on his ability to function in the workplace . . . the
ALJ relied on non-treating, non-examining physicians who reviewed the reports of the treating
physicians to form an opinion of [claimant's] RFC. In our opinion this does not satisfy the ALJ's
duty to fully and fairly develop the record. The opinions of doctors who have not examined the
claimant ordinarily do not constitute substantial evidence on the record as a whole.").

"It is well settled that an ALJ may not discount a claimant's allegations of disabling pain
solely because the objective medical evidence does not fully support them." *O'Donnell v. Barnhart*,
318 F.3d 811, 816 (8th Cir. 2003). The ALJ must also consider, among other things, observations by
third parties. *Id.* In the *O'Donnell* case, the Claimant's allegations of pain could not be explained
by her relatively normal medical examinations. Her only document able medical condition (like Mr.
Emberlin) was a degenerative spine condition. The appellate court also rejected the ALJ's assertion
that her application for benefits was financially motivated because "all disability claimants are
financially motivated to some extent." *Id.* at 817. Like Mr. Emberlin, after exhaustive testing and
treatment she was diagnosed with chronic pain syndrome. "In similar situations, we have stated that
consistent diagnosis of chronic pain coupled with a long history of pain management and drug therapy
was an objective medical fact supporting claimant's allegations of disabling pain." *Id.*    Also
supporting her claim was her persistent use of a morphine-like drug. *Id.* Her description of limited
physical activities was uncontradicted, consistent with the description she provided to her doctors,

31

and corroborated by other witnesses at the hearing. *Id.* at 817. As in *O'Donnell*, the evidence as a whole in this case does not support a finding that Mr. Emberlin is a malingerer or is exaggerating his symptoms for financial gain. Although they have not been able to fully explain his symptoms, Mr. Emberlin's physicians have not indicated he is magnifying his symptoms or malingering.[15] *O'Donnell*, 318 F.3d at 818. Instead they have continued to treat him with increasing doses of powerful narcotic pain medication. Likewise his description of limited physical activities is uncontradicted, consistent with what he has told his physicians, and corroborated by his fiancee. For all of these reasons, the ALJ's credibility finding regarding Mr. Emberlin's pain complaints and resulting limitations is not supported by substantial evidence.

### 3.    The ALJ's Hypothetical to the Vocational Expert

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). However, "[t]his does not mean that the hypothetical must include all of the impairments a claimant alleges. It is required to include only those impairments that the ALJ finds actually exist, and not impairments the ALJ rejects–assuming of course, that the ALJ's findings are supported by substantial evidence." *Onstad v. Shalala*, 999 F.2d 1232, 1234-35 (8th Cir. 1993). The ALJ's hypothetical question to the vocational expert must include all the appropriate impairments, and testimony by a vocational expert constitutes substantial evidence only when based on a proper hypothetical question. *Tucker v. Barnhart*, 363 F.3d 781, 784 (8th Cir. 2004). Jobs which are identified by the vocational expert, therefore, which include unrealistic physical demands included in a flawed hypothetical by the ALJ cannot, therefore, constitute substantial, gainful employment.

As explained above, the opinions of non-treating, non-examining physicians are ordinarily

---

[15]Dr. Fanciullo acknowledged Mr. Emberlin had degenerative arthritis but noted Mr. Emberlin's pain complaints were out of proportion with the physical findings. He did not suggest, however, that Mr. Emberlin was malingering. Dr. Fanciullo's note is completely consistent with Dr. Tieszen's January 6, 2003 entry which expresses his belief that Mr. Emberlin is *not* malingering even though the cause for his pain cannot be objectively documented.

insufficient to constitute substantial evidence upon which to formulate an accurate residual functional capacity. *Nevland v. Apfel*, 204 F.3d 853, 858 (8ᵗʰ Cir. 2000). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." *Id.* In this case, as in *Nevland*, the ALJ should have sought opinions from the treating physicians or in the alternative ordered consultative examinations to assess Mr. Emberlin's residual functional capacity. Because the hypothetical upon which the vocational expert relied was based upon the opinions of two non-treating, non-examining State Agency Physicians who relied on outdated information to form their opinions, the hypothetical, and thus the vocational expert's opinion is likewise not supported by substantial evidence.

## CONCLUSION

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Doc. 10) be GRANTED, and that the Commissioner's denial of benefits be REVERSED and REMANDED for reconsideration.

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8ᵗʰ Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is

presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. *See also Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## **NOTICE TO PARTIES**

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this __7th__ day of ~~January~~ Feb, 2008.

BY THE COURT:

34

_____
John E. Simko
United States Magistrate Judge

ATTEST:

JOSEPH HAAS, Clerk